UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CONNIE PATTERSON, on behalf of herself and all others similarly situated,<br><br>*Plaintiff*,<br><br>-against-<br><br>RAYMOURS FURNITURE COMPANY, INC.,<br><br>*Defendant*. | Civil Action No. 14-cv-5882 (VEC)<br><br>**DECLARATION OF STEPHEN MCPEAK** |

**STEPHEN MCPEAK**, hereby swears under the penalty of perjury as follows:

1. I am currently employed by Defendant Raymours Furniture Company, Inc. ("Raymour & Flanigan" or the "Company"), as its Vice President of Human Resources. I have held this position since June 2010. Prior to that time, I served as the Company's Director of Compensation and Benefits.

2. As the Vice President of Human Resources, my responsibilities include managing the personnel who maintain the Company's business records (such as personnel files) concerning employees who work or have worked for Raymour & Flanigan. I am also responsible for developing, implementing and ensuring compliance with Raymour & Flanigan's Associate Handbook, which sets forth the Company's work rules, policies and procedures. In addition, departmental employees who report directly to me are responsible for maintaining Raymour & Flanigan's Self-Service Portal for Associates (the "Portal"). The Portal is an online system that allows employees to access their payroll information (such as weekly Direct Deposit notices and end-of-year W-2 forms), manage employment benefits, and view Company policies from virtually anywhere via the internet.

3. As a function of my responsibilities, summarized above, and based upon my personal knowledge and a review of Raymour & Flanigan's business records, I am fully familiar with the facts set forth herein.

4. Raymour & Flanigan is a corporation incorporated under the laws of the State of New York and has its principal place of business in Liverpool, New York. Raymour & Flanigan operates retail furniture stores in seven states, including New York.

5. Raymour & Flanigan hired Plaintiff Connie Patterson on June 20, 2005, to work as a Sales Associate in its Johnson City, New York, retail furniture showroom. At the time of her hire, Raymour & Flanigan provided Ms. Patterson with its Associate Handbook. On June 24, 2005, Ms. Patterson signed a New Hire form acknowledging receipt of the Associate Handbook and confirming that she understood its contents. A copy of Ms. Patterson's New Hire form, dated June 24, 2005, is attached hereto as Exhibit 1.

6. In October, 2009, Raymour & Flanigan updated its Associate Handbook and provided copies to all of its Sales Associates, including Ms. Patterson. On October 6, 2009, Ms. Patterson signed a Receipt and Acknowledgment of the Associate Handbook. As part of her acknowledgment of receipt, Ms. Patterson confirmed her promise to become familiar with the terms of the Associate Handbook and to keep abreast of changes to Company policies as they occurred. She also acknowledged that all future changes to the policies set forth in the Associate Handbook would apply to her. A copy of Ms. Patterson's October 6, 2009 Receipt & Acknowledgment of Raymour & Flanigan Associate Handbook is attached hereto as Exhibit 2.

7. On July 16, 2010, Raymour & Flanigan notified all Sales Associates, Company-wide, that it had implemented the Portal. Each Sales Associate, including Plaintiff, received two forms of notification of the new service – an email and a paper copy of the announcement that

accompanied each employee's weekly pay stub. Copies of the July 16, 2010 e-mail, which I personally authored and sent to Raymour & Flanigan's entire Sales Associate population, and the July 12, 2010 memo, are attached hereto as Exhibits 3 and 4, respectively.

8. At the same time that it rolled out the Portal, Raymour & Flanigan also uploaded its then-current Associate Handbook to the Portal. In order to register with the Portal and gain secure access, Sales Associates, including Ms. Patterson, were required to input their Social Security number and contact information matching what appeared in Raymour & Flanigan's payroll system. According to Raymour & Flanigan's business records, on July 19, 2010, at 5:48 p.m., Ms. Patterson registered for a secure Portal ID and password by providing her Social Security number, her home e-mail address, and her work telephone number, all of which matched Raymour & Flanigan's payroll system. As a result, she was issued a secure ID. A copy of a printout from Raymour & Flanigan's business records showing Ms. Patterson's registration with the Portal is attached hereto as Exhibit 5.

9. Sales Associates regularly utilize the Portal to access a variety of important documents and benefits information. For example, Raymour & Flanigan holds open enrollment for healthcare, dental, vision and other employment benefits in October of each calendar year. Since October 2010, employees of Raymour & Flanigan, including Ms. Patterson, have been required to confirm benefit elections using the Portal. As of January 2011, all employees who have Direct Deposit must utilize the Portal in order to access their pay stubs.

10. Ms. Patterson accessed the Portal throughout her employment. As can be seen from Exhibit 5, she last accessed it on November 6, 2013, at 3:35 p.m.

11. Ms. Patterson was terminated for cause in February of 2014.

12. Over two years before Ms. Patterson was terminated, Raymour & Flanigan adopted an Employment Arbitration Program (the "Arbitration Program"), which it incorporated into its Associate Handbook effective February 2012 and uploaded to the Portal. A copy of the Arbitration Program, as it appeared at pages 57-66 of the Associate Handbook, is attached hereto as Exhibit 6.

13. On February 1, 2012, by broadcast e-mail, Raymour & Flanigan notified all Sales Associates, including Ms. Patterson, that the Handbook was being updated, and that an Arbitration Program had been added. That e-mail alerted the Sales Associates that:

> **Because of the significant updates that have been made, we will be requiring all associates to acknowledge that they have reviewed the revised handbook.** For your convenience you will be able to review and acknowledge the revised handbook through the **Self Service Portal for Associates**. Simply click on the link below and it will take you to the log in page of the portal… Below is a brief description of the updates: …
>
> - **Employment Arbitration Program (Page 57-66).** The addition of this program, similar to many other such programs adopted by employers across the country, implements a consistent and efficient way for our associates and the company to resolve employment disputes covered by the program.
>
> It is important that you give special attention to these updated sections when reviewing the handbook.

A copy of the February 1, 2012 e-mail is attached hereto as Exhibit 7.

14. To help employees with the process of accessing, reviewing and acknowledging the updated Associate Handbook and the Arbitration Program, Raymour & Flanigan published step-by-step procedures on navigating and utilizing the Portal. A copy of these procedures is attached hereto as Exhibit 8.

15. All Raymour & Flanigan Sales Associates, including Ms. Patterson, were required, as a term and condition of their employment, to access the updated policies (including the Arbitration Program), review them, and certify that they read each policy by checking a box marked, "I certify that I have read the policy above" and then clicking a button marked "Done." Upon clicking the "Done" button, the time and date of the employee's act was electronically memorialized in the Portal.

16. During the procedure for accessing, reviewing and acknowledging Raymour & Flanigan's policies, employees (including Ms. Patterson) can see, scroll through, review and, if desired, print a full copy of the Associate Handbook and Arbitration Program.

17. On February 9, 2012, at 1:41 p.m., Ms. Patterson logged onto the Portal and acknowledged her access, receipt and review of the updated Associate Handbook and Arbitration Program. A copy of this record from the Portal is attached hereto as Exhibit 9.

18. Sixteen months later, in April 2013, also before Ms. Patterson was terminated, Raymour & Flanigan again updated its Associate Handbook and Arbitration Program. The Company again notified all Sales Associates, including Ms. Patterson, by e-mail on April 8, 2013 that they were required to access the Associate Handbook through the Portal, read it and acknowledge receipt. A copy of the updated Associate Handbook is attached hereto as Exhibit 10. A copy of the April 8, 2013 e-mail is attached hereto as Exhibit 11.

19. On April 27, 2013, at 10:28 a.m., Ms. Patterson logged onto the Portal and acknowledged her access, receipt and review of the Associate Handbook containing the revised Arbitration Program. A copy of this record from the Portal is attached hereto as Exhibit 12. That updated Associate Handbook and Arbitration Program then governed Ms. Patterson's conditions of employment until she was terminated in February of 2014.

20. The Arbitration Program is written and presented to employees in an easy-to-read, FAQ-type format. It states that the Program is "an essential element of [each employee's] continued employment relationship with Raymour & Flanigan and is a condition of [each employee's] employment."

21. The Arbitration Program describes covered disputes as follows:

> The Program covers all employment-related and compensation-related "Claims" between "you" and "us" (those terms are further defined below) that are asserted or pursued at any time after the effective date of this Program, regardless of whether those Claims arose before or after the effective date of this Program and regardless of whether such Claims were initially raised before the effective date of this Program. It includes disputes that you raise regarding any compensation plans you have previously entered into with Raymour & Flanigan.

22. The term "Claims" is defined as follows:

> [A]ny employment-related or compensation-related claims, disputes, controversies or actions between you and us that in any way arise from or relate to your employment with us or the termination of your employment with us **and** that are based upon a "legally-protected right." This includes disputes about your hiring, firing, wages or compensation, discipline, leaves of absence, accommodations and workplace treatment as well as our policies and practices (including any pattern, practice, act or omission) relating to such matters. "Claim" means not only initial claims but also counterclaims, cross-claims and third-party claims, regardless of whether such claims seek legal, equitable or declaratory relief. Examples of such Claims include (but are not limited to) those alleging discrimination, harassment, hostile work environment, retaliation or failure to pay wages in accordance with law.

23. The Arbitration Program also defines a "legally-protected right" and identifies specific state and federal laws covered by the Arbitration Program as follows in relevant part:

> "Legally-protected right" means any right that is guaranteed to you or protected for you by statute, regulation, ordinance, constitution, contract or common law. This includes (but is not limited to) rights under: . . . .

- the federal Fair Labor Standards Act or any state wage and hour laws. . . .

- any other federal, state or local statute, regulation or common law doctrine regarding employment discrimination, retaliation, whistleblowing, leave of absence, interference with protected rights, conditions of employment or termination of employment or payment of salary, wages commissions, paid time off or expense reimbursements.

24.  The Arbitration Program prohibits employees from pursing "Claims" as so-defined on a class or collective action basis, which is explained to employees in the same easy to understand FAQ format as follows:

> ***CAN CLAIMS BE DECIDED BY CLASS OR COLLECTIVE ACTION?***
>
> **No. This section describes the "Class Action Waiver" of the Program. Claims under this Program cannot be litigated by way of class or collective action. Nor may Claims be arbitrated by way of a class or collective action. All Claims between you and us must be decided individually. This means that, notwithstanding any other provision of this Program, if you or we elect to arbitrate a Claim, neither you nor we will have the right, with respect to that Claim, to do any of the following in court or before an arbitrator under this Program:**
>
> - **obtain relief from a class action or collective action, either as a class representative, class member or class opponent;**
> - **act as a private attorney general; or**
> - **join or consolidate your Claim with the Claims of any other person.**
>
> **Thus, the arbitrator shall have no authority or jurisdiction to process, conduct or rule upon any class, collective, private attorney general or multiple-party proceeding under any circumstances.**

25.  I understand that on August 6, 2014, another former Raymour & Flanigan employee, David J. Ambrose, consented to opt into the above-captioned action. The

7

circumstances under which Mr. Ambrose agreed to be bound by Raymour & Flanigan's Arbitration Program are virtually identical to those under which Ms. Patterson agreed to be bound.

26. Raymour & Flanigan hired Mr. Ambrose on July 7, 2002, to work as a Sales Associate in the Johnson City showroom, where Ms. Patterson later worked. As with Ms. Patterson, Raymour & Flanigan provided Mr. Ambrose with its Associate Handbook and he acknowledged receipt of it on July 10, 2002. A copy of his acknowledgement is attached hereto as Exhibit 13.

27. Mr. Ambrose also acknowledged receipt of Raymour & Flanigan's updated Associate Handbook on October 6, 2009 and, like Ms. Patterson, confirmed his promise to become familiar with its terms and to keep abreast of changes to Company policies as they occurred; he also acknowledged that all future changes to those polices would apply to him. A copy of Mr. Ambrose's October 6, 2009 Receipt & Acknowledgment of Raymour & Flanigan Associate Handbook is attached hereto as Exhibit 14.

28. Like Ms. Patterson, Mr. Ambrose received notice of Raymour & Flanigan's July 2010 rollout of the Portal (where he and others could access the Associate Handbook and other employment-related information), registered for access to the Portal on July 17, 2010, and received a secure Portal ID and password via the same method that applied to Ms. Patterson. A copy of a printout from Raymour & Flanigan's business records showing Mr. Ambrose's registration with the Portal is attached hereto as Exhibit 15. Mr. Ambrose accessed the Portal throughout his employment. As can be seen from Exhibit 15, he last accessed it on April 27, 2013, at 10:24 a.m.

29.     Mr. Ambrose, like Ms. Patterson, also received notice of Raymour & Flanigan's Arbitration Program when it was rolled out in February 2012, and he acknowledged receipt of Arbitration Program on February 2, 2012, at 3:45 p.m., in the same manner used by Ms. Patterson. A copy of Mr. Ambrose's acknowledgment from the Portal is attached hereto as Exhibit 16.

30.     Mr. Ambrose received notice of Raymour & Flanigan's April 2013 updates to its Associate Handbook and Arbitration Program, in the same manner that Ms. Patterson received that notice and, like Ms. Patterson, he acknowledged those updates on April 26, 2013, at 5:47 p.m. by logging onto the Portal. A copy of this record from the Portal is attached hereto as Exhibit 17. Thereafter, Mr. Ambrose remained employed with Raymour & Flaniganuntil May 4, 2013, at which time he voluntarily retired.

I further declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing statements made by me are true and correct.

Dated: September 8, 2014         By: _____
                                      Stephen McPeak